# Illinois Official Reports

## Appellate Court

---

### *Schweihs v. Chase Home Finance LLC*, 2021 IL App (1st) 191779

---

| | |
|---|---|
| Appellate Court Caption | MELINDA SCHWEIHS, Plaintiff-Appellant, v. CHASE HOME FINANCE LLC, Successor by Merger to Chase Manhattan Mortgage Corporation, Successor by Merger With Chase Mortgage Company-West, f/k/a Mellon Mortgage Company; SAFEGUARD PROPERTIES, LLC; TODD GONSALEZ; and EDILFONSO CENTENO, Defendants-Appellees. |
| District & No. | First District, Second Division<br>No. 1-19-1779 |
| Filed<br>Rehearing denied | June 29, 2021<br>July 22, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-L-6030; the Hon. James N. O'Hara and the Hon. Elizabeth M. Budzinski, Judges, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Edward T. Joyce and Jennifer L. Doherty, of Law Offices of Edward T. Joyce & Associates, P.C., and Joan M. Mannix, of Joan M. Mannix, Ltd., both of Chicago, for appellant.<br><br>Darcy L. Proctor, of Tressler LLP, of Chicago, for appellee Chase Home Finance LLC. |

Jeffrey S. Pavlovich and Gerard C. Fosco, of Leahy, Eisenberg & Fraenkel, Ltd., of Joliet, for other appellees.

Panel          PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Lavin and Cobbs concurred in the judgment and opinion.


**OPINION**

¶ 1      This appeal involves tort claims of trespass, negligent trespass, and assault. It arises from an incident on June 22, 2010, when defendants, Todd Gonsalez and Edilfonso Centeno, went to the home of the plaintiff, Melinda Schweihs, on a work order issued by defendant Safeguard Properties, LLC (Safeguard), to change the locks and "winterize" the house if it was found to be vacant. Acting on the incorrect belief that the house was vacant, Gonsalez and Centeno removed the lock on the back door, and Gonsalez entered the house. The plaintiff, who was in fact residing in the house, was present at the time. She became quite startled and distressed by the defendants' entry into her home, demanded they immediately leave, and called her lawyer and the police.

¶ 2      At the time of the incident, the plaintiff had fallen behind on her monthly mortgage payments owed to the defendant, Chase Home Finance LLC, successor by merger to Chase Manhattan Mortgage Corporation, successor by merger with Chase Mortgage Company-West, f/k/a Mellon Mortgage Company (Chase), and Chase had filed foreclosure proceedings against the plaintiff. The plaintiff's mortgage contained the following provision:

> "7. Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property *** then *Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include* paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorney's fees and *entering on the Property to make repairs*. Although Lender may take action under this paragraph 7, Lender does not have to do so." (Emphases added.)

Also, four weeks prior to the incident at issue, Chase had obtained a judgment of foreclosure against the plaintiff through an order that included the following provision:

> "In order to protect and preserve the mortgaged real estate, it has or may also become necessary for [Chase] to pay fire and other hazard insurance premiums on the real estate or to make such repairs to the real estate as may reasonably be deemed necessary for the proper preservation thereof."

However, the plaintiff was within the statutory redemption period and had the right to full use and enjoyment of her house as of that time. See 735 ILCS 5/15-1603(b)(1)(ii) (West 2010).

¶ 3    The Federal National Mortgage Association (Fannie Mae) also had an interest in the plaintiff's loan, and Chase was the loan servicer on behalf of Fannie Mae.[1] Fannie Mae issues certain requirements and procedures for the servicing of mortgages that are delinquent or in foreclosure, including a requirement that a mortgage servicer perform property maintenance functions on mortgaged property throughout the process of a foreclosure, which "includes securing the property, *** winterizing the property, etc."[2] Under these requirements, a loan servicer must "[s]ecure a vacant property, by changing exterior locks, securing all windows and exterior doors." To accomplish property maintenance functions such as these, Chase contracts with outside companies that perform property inspections and preservation services. Here, that company was Safeguard. In turn, Safeguard hires independent local vendors to physically go to properties to perform property inspection and preservation services. The local vendor that Safeguard hired in this case was A1 Builders, Inc. (A1 Builders), and Gonsalez and Centeno were subcontractors hired by A1 Builders.

¶ 4    A master contract exists between Chase and Safeguard that describes the scope of services and activities that Chase requires of Safeguard. It provides that when a mortgage is 45 days delinquent, Chase automatically issues Safeguard a request to perform a property inspection. "Upon receipt of the request, [Safeguard] will promptly perform the Property inspection Services in accordance to [Chase's] investor's/insurer's requirements." The contract goes on to provide that when Safeguard performs an inspection and "assesses the Property as *abandoned*," it shall promptly notify its property preservation department "to begin the property preservation process as described below." (Emphasis added.) The contract then provides that, as part of that property preservation process, "[u]pon notification that the Property is *abandoned* as provided above, *** [Safeguard] will assess the repairs or maintenance needed, and thereafter schedule the required work in accordance with the applicable Requirements." (Emphasis added.) The contract's list of activities required to be performed by Safeguard includes, under the subheading of "Property Preservation," changing locks, securing, and winterizing.

¶ 5    Chase also had an internal policy and procedure for property inspection and preservation, which states that its property inspection vendors send a report of property inspection results to Chase on a daily basis indicating one of five occupancy statuses for a property:

"Occupied—The property is occupied based on visual observations, such as vehicles parked in the driveway, utility meters running, furniture being visible, and/or occupants being present.

Vacant—The property is vacant based on the absence of the personal items on or in the property.

Unknown—Vendor was unable to determine the vacancy due to no one home to verify and could not see if personals were on site.

Occupied By Unknown—Personals are present but no one is available to verify who is living there.

---

[1]The parties dispute whether Fannie Mae should be considered the owner of the plaintiff's mortgage or merely an investor. However, they agree that Fannie Mae had an interest in it and that Chase's servicing of the mortgage was subject to Fannie Mae's loan servicing guidelines.

[2]Winterizing a property generally refers to shutting off the water supply to the property and removing water from toilets, hot water heaters, etc., to avoid any issues associated with freezing.

> 1st Time Vacancy—The property is reported as vacant for the 1st time since monthly property inspections commenced."

The policy and procedure also states that Chase's business practices require the performing of property preservation work on "vacant properties," which includes securing the property, winterizing it, and cutting the grass. It states that Chase requires property preservation vendors to secure a property immediately upon notification of a "vacancy," which they do by changing door locks, among other things.

¶ 6    Prior to June 17, 2010, Safeguard's vendors had conducted monthly inspections of the plaintiff's property pursuant to Chase's requests, all of which had indicated that the plaintiff's residence was occupied. However, on June 17, 2010, Safeguard received a report from a vendor named John Albert stating that the property was vacant for the first time. The report indicated that the gas had been shut off, that the electric and water were on, that the grass had been mowed and was three inches high, and that no for-sale sign was posted. It recommended maintenance to the property in the form of changing the locks and winterizing it. In response to Albert's report, a Safeguard representative requested that he clarify what he saw on site that led him to believe that the home was vacant. In response, Albert communicated the following:

> "The property looks like it belonged to a hoarder, there was never an answer anytime I have been at the property[.] This past inspection, the same thing, but I did notice that the gas meter is turned off, electricity and water are still? [*sic*] on, and there is a dumpster in front of property, indicating that someone is trying to clean property. I spoke to the neighbor to the left? [*sic*] and across the street of the property, and they also verified that they have seen people at property, but not fully occupied??"

¶ 7    Based on Albert's report, a Safeguard representative then issued a work order to A1 Builders to change the locks and winterize the property, tasks which were assigned to Gonsalez and Centeno to perform on June 22, 2010. The work order stated that they were to complete the work only "[i]f property is vacant." It also stated, "If property is occupied, report how verified and do no work." Additionally, it stated that if the property was posted for sale, they were to make two attempts to contact the realtor to confirm that the property was not being maintained prior to doing any work.

¶ 8    Gonsalez and Centeno went to the plaintiff's residence the same day. Gonsalez testified during his discovery deposition that when they arrived, he and Centeno conducted a visual inspection of the property. He observed that the grass on the property was uncut and the trees were overgrown. Gonsalez knocked on the front door but did not receive an answer. He also checked the gas meter and the water spout and determined that the water and gas utilities were off. He observed a "for sale" sign at the property, along with a dumpster and a car parked in the driveway.

¶ 9    Gonsalez spoke with a neighbor who lived across the street from plaintiff's home. Gonsalez testified that the neighbor told him that the house was not occupied but a woman would come and go on occasion, and there were no lights on at the home at night. He also testified that the neighbor told him she had never seen the car that was in the plaintiff's driveway before, but that people from the school down the street would sometimes park there "knowing it was a vacant property."

¶ 10    Centeno testified during his discovery deposition that he did not talk with any neighbors but that he recalled that Gonsalez told him the neighbor stated that "they come and go. And sometimes they leave their vehicle there."

¶ 11    After speaking with the neighbor, Gonsalez again knocked on plaintiff's front door, without a response. He testified that he and Centeno spent in excess of 45 minutes determining if the house was occupied. It is undisputed, however, that they never called the realtor listed on the "for sale" sign posted on the property, and nobody called the attorney who was representing the plaintiff in the foreclosure case. They entered the backyard through a latched gate of the home's six-foot security fence. Gonsalez testified that through the sliding glass door he saw boxes of what appeared to be garbage piled "like a trashed house, which I see often." He contacted management at A1 Builders, relayed the above information, and was told to proceed with the work order.

¶ 12    To secure the premises, Gonsalez had to remove one of the secondary locks on the property. He removed the lock to the back door. Because of the boxes and debris blocking the entrance, Gonsalez could only open the door about a foot and had to climb over them to enter the home. Centeno remained at the back door and never entered the home. Once inside, Gonsalez noticed that something was also leaking from the ceiling onto the top of the debris. He testified that when he was about four or five feet inside the house, he was confronted by the plaintiff. Both parties were startled. The plaintiff said that she wanted them out of her house and that she was calling her lawyer. Gonsalez responded he was with the mortgage company and asked her to come to the front door to speak with him. Gonsalez then left and went around to the front and knocked on the front door, but the plaintiff did not answer. Gonsalez and Centeno then waited for the police to arrive.

¶ 13    The plaintiff was a 58-year-old single woman who was living alone. She testified during her discovery deposition that her home was in foreclosure; however, she anticipated selling her home while it was still in the redemption period. The plaintiff testified that when she placed the house for sale, she informed the realtor that the realtor was to accompany anybody that came to the property. She also testified that she was not showing the interior of the house because of the "mess" and "stuff everywhere" in piles and in boxes. She described herself as a "packrat" and testified she was in the process of packing her belongings, which were in disarray.

¶ 14    The plaintiff heard knocking on the front door while she was in the basement; however, she was on the phone and did not respond. After the phone call, she went to the second floor of her home to continue packing. She stated that she heard the flap drop on the metal mailbox attached to her house, at which time she looked out a second-floor window. She testified that she saw two men standing in her driveway, along with a green truck facing the street, without any markings except for a "Harley" decal on the back window. The plaintiff thought that they may have been potential buyers looking at the house, and she decided to continue to pack.

¶ 15    A short time later, the plaintiff heard noises coming from the back of the house. She went downstairs to identify the noise and encountered Gonsalez in the family room. She testified that Gonsalez was not wearing a uniform but was in street clothes with tattoos exposed. Centeno was in the open back doorway. The plaintiff testified that she spoke first and asked, "Who are you and what are you doing in my home?" Although neither man verbally threatened her, their presence blocked the back door to her house. They were standing close to the plaintiff and stated in a "forceful way" that Chase had sent them to secure and winterize the house and that she needed to come outside to talk with them. When she first saw Gonzalez, he moved a little toward her and had his arms out. Based on the presence of the two men in her house and their appearance and movements, the plaintiff testified that she feared she was going to be

attacked or raped. She told them to leave and immediately called her attorney and the police. She stayed on the phone with the police dispatcher until the police arrived. The police investigated, speaking with plaintiff, Gonsalez, Centeno, and the neighbor with whom Gonsalez had spoken. No arrests were made. Gonsalez offered to replace the back-door lock with a new lock and key, but the plaintiff declined.

¶ 16    The plaintiff testified that after the incident she was afraid while in her home and fearful that she may be attacked. On the same day of the incident, plaintiff went to the hospital because she "didn't feel right." Subsequently, she sought treatment, therapy, and medication from multiple doctors for issues with sleeping, post-traumatic stress, anxiety, and depression. The plaintiff stated that she felt anxiety when approaching her home and that at times she stayed in hotels because of her fear of subsequent break-ins. She was inhibited from packing and preparing her home for sale because of this fear. Additionally, she alleged that she sought temporary leave from her employment due to the incident but that her request was denied and she was instead terminated.

¶ 17    Later that year, the plaintiff filed a five-count complaint against the defendants, alleging trespass, negligent trespass, private nuisance, intentional infliction of emotional distress, and negligence. Following discovery and motion practice, the defendants filed motions for summary judgment as to each count of the plaintiff's complaint. Before ruling on those motions, the trial court granted the plaintiff leave to amend the count alleging negligence to one alleging negligent infliction of emotional distress. The trial court then entered summary judgment in the defendants' favor on the plaintiff's counts alleging private nuisance and intentional infliction of emotional distress, dismissed the amended count alleging negligent infliction of emotional distress, and made a finding under Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) that there was no just reason for delaying the appeal of its order. The trial court found that issues of fact prevented the entry of summary judgment on the counts alleging trespass and negligent trespass, and it ordered that those two counts be held in abeyance pending the appeal of its ruling on the other counts.

¶ 18    The case was appealed to this court, and a majority affirmed the entry of summary judgment on the claims for intentional infliction of emotional distress and private nuisance and the dismissal of the claim for negligent infliction of emotional distress. *Schweihs v. Chase Home Finance, LLC*, 2015 IL App (1st) 140683. The supreme court then allowed a petition for leave to appeal involving the two emotional distress counts. *Schweihs v. Chase Home Finance, LLC*, 2016 IL 120041. On the claim alleging negligent infliction of emotional distress, the supreme court held that the amended complaint failed to allege a cause of action because of the plaintiff's inability to allege that she suffered a contemporaneous physical injury or impact, as required for that tort. *Id.* ¶ 44. In a special concurrence, Justice Garman noted that an allegation of a contemporaneous physical impact or injury was not a pleading requirement for a plaintiff to recover emotional distress damages as an element of the compensatory damages for a tort other than negligent infliction of emotional distress. *Id.* ¶ 80 (Garman, J., specially concurring). Justice Garman further noted that the plaintiff still had other tort claims pending (*i.e.*, the two trespass counts) and that it was unknown then whether damages for emotional distress were available for those other claims or whether such damages could be proven. *Id.* ¶ 81.

¶ 19    On the claim alleging intentional infliction of emotional distress, the supreme court held that there was no genuine issue about the fact that the conduct of Gonsalez and Centeno did

not rise to the requisite level of being "extreme and outrageous." *Id.* ¶¶ 54, 61 (majority opinion). In doing so, the court rejected the plaintiff's argument that the defendants had "no legal justification for their entry into the property," on the basis of the provision in the plaintiff's mortgage allowing Chase to enter the property to make repairs if the plaintiff fell into default. *Id.* ¶ 57. Citing that contractual provision and the provision of the foreclosure judgment order that allowed Chase to make such repairs as it reasonably deems necessary for the preservation of the real estate, the supreme court stated: "Therefore, we find that Chase had the right to enter the property to make reasonable repairs for the preservation of the property. Although plaintiff argues that the house was not in need of repairs, she does not explain how defendants were to know or determine that." *Id.* ¶ 58.

¶ 20        Following remand, the plaintiff was granted leave to amend her compliant two additional times. The operative third amended complaint thus contained counts alleging trespass, negligent trespass, and assault. It initially contained a count for negligence also, but that count was dismissed and is not at issue in this appeal. The trial court also granted (on reconsideration) a motion to dismiss the count alleging assault on the basis that the assault claim was barred by the doctrine of *res judicata*. In the same order in which it dismissed the assault count, the trial court also denied motions for summary judgment filed by the defendants on the assault count.

¶ 21        The case was ultimately assigned for trial on the trespass claims. Various motions *in limine* and other pretrial motions were considered by the trial judge. Three of those are pertinent to this appeal. First, the trial court granted a motion *in limine* barring the plaintiff from presenting evidence concerning the emotional distress she suffered as a result of the incident at issue on the basis that Illinois law does not permit the recovery of damages for emotional distress on a claim of trespass to real property. Second, the trial court denied the plaintiff's motion for leave to amend her complaint to include a prayer for relief seeking punitive damages (see 735 ILCS 5/2-604.1 (West 2018)), finding that there was no reasonable likelihood that facts could be established to support punitive damages. This ruling was based on the extent of the investigation that Gonsalez and Centeno undertook to determine whether the plaintiff's property was occupied prior to entering it, as well as the fact that their entry was made according to a contractual right under the mortgage.

¶ 22        Finally, the trial court granted in part a motion *in limine* to bar the plaintiff from presenting evidence on the internal policies and procedures of Chase and Safeguard. That motion *in limine* asserted that Chase, through its agents, had a legal justification to enter the plaintiff's property under the mortgage contract and the judgment of foreclosure and the internal policies and procedures of Chase and Safeguard were irrelevant because they did not create or define either the scope of the right to enter the plaintiff's property or any duty or standard of care for exercising that right. In the plaintiff's written response, the plaintiff argued that, despite the fact that the mortgage contract gave the lender broad rights to protect its property, Chase still had to exercise that right in an appropriate manner, without interfering with the plaintiff's right to uninterrupted use and enjoyment of her home during the redemption period. The plaintiff argued that the internal protocols of Chase and Safeguard were relevant because they set forth "the standard of care to be exercised by Defendants in making an inspection" and "the reasonable manner in which Chase must act." The plaintiff argued that, under those protocols (which, the plaintiff asserted, encompassed and were consistent with Fannie Mae's rules and regulations), the only circumstances in which Chase and its agents had a right to enter the plaintiff's home to change the locks or winterize was if the home was first determined to be

" 'abandoned.' " See *supra* ¶ 5. The plaintiff argued that the defendants had ignored various indications that the home had not been "abandoned" as of the day at issue, including a car and dumpster being in the driveway, some of the utilities being on, and the fact that a neighbor said that someone comes and goes. The plaintiff argued that it was a fact question for the jury how Chase was to implement its right to enter the plaintiff's home under the mortgage agreement and the Chase and Safeguard protocols were relevant on that question.

¶ 23    At oral argument, the parties made arguments that were largely consistent with those set forth in their written materials. The defendants' attorneys reiterated that it was a trespass case in which the defendants' right to enter the property was governed by the terms of a contract, as opposed to a negligence case governed by a standard of reasonable conduct. They argued that the internal protocols were not incorporated into the contract and were not provisions upon which the plaintiff had any right to rely. The plaintiff's attorney acknowledged that Chase and its agents had a contractual right to determine whether repairs were necessary and could make an inspection, but he argued that the critical issue in the case was "how to implement that right" to enter the property consistent with the plaintiff's right to live in the house during the redemption period. He argued that it was only appropriate for Chase's agents to enter if they first determined there had been an "abandonment," as required by the protocols. He argued that the internal protocols were evidence of what the standard of care was.

¶ 24    The trial court ruled that the protocols, policies, and procedures of Chase, Safeguard, and Fannie Mae could not be considered by the jury to determine whether a trespass had occurred. It reasoned that there was a mortgage contract between the parties that gave Chase the right to enter the property to make repairs for the preservation of the property, a right which had been specifically found to exist by the supreme court (see *Schweihs*, 2016 IL 120041, ¶¶ 57-58), and that contractual right was not qualified by or made subject to compliance with any internal protocols or procedures of Chase, Safeguard, or Fannie Mae. The trial court reasoned that, if it found that the internal protocols and procedures were incorporated into the contract, it would be changing the terms of the parties' contract. It reasoned that the case was one for trespass, not a case involving the defendants' duties and obligations regarding implementation of the right to enter the plaintiff's house.

¶ 25    Following this ruling by the trial court, a discussion occurred at the hearing about whether the claims for trespass could still be proven in light of the evidence that the trial court had just barred. The plaintiff's attorney acknowledged that, given that the trial court's ruling prevented him from introducing evidence to prove that the defendants had wrongfully implemented their right to enter, "there's no trespass case to try." As a result, the trial court entered an order dismissing the lawsuit with prejudice. The plaintiff then filed a timely notice of appeal.

¶ 26                                    ANALYSIS
¶ 27                                  Trespass Claims
¶ 28    We first address the plaintiff's argument that the trial court erred when it dismissed the plaintiff's trespass claims with prejudice after barring the plaintiff from introducing evidence of the protocols, policies, and procedures of Chase, Safeguard, and Fannie Mae. The plaintiff contends that the trial court's barring of this evidence was error. She argues that she should have been allowed to use this evidence to show how the defendants themselves interpreted their contractual right to enter the plaintiff's house during the redemption period and to prove that they wrongfully implemented that right by entering her house without determining that it

had been abandoned and when there was no indication that repairs or preservation measures were needed.

¶ 29　Preliminarily, it is not clear to this court exactly what documents the plaintiff was barred from introducing by the trial court's order. Although the trial court directed the parties to prepare an order setting forth exactly what evidence had been barred, it does not appear that such an order was entered. Furthermore, the parties use varying terminology to refer to the evidence barred. From the parties' briefs to the trial court and this court, it appears to us that the evidence barred included (1) the master contract between Chase and Safeguard; (2) an internal Chase document titled "Property Inspection & Preservation All Products Operating Procedure"; and (3) Fannie Mae documents titled "Property Maintenance and Management: Property Preservation Matrix and Reference Guide" and "2010 Servicing Guide Update Parts VII and Parts VIII." We note that the plaintiff repeatedly refers without specific citation to Fannie Mae's "rules and regulations," but it is not our understanding that any of the evidence involved is a regulation having the force of law. For simplicity, we will refer to all of these documents as "policies and procedures."

¶ 30　Furthermore, although the plaintiff's third amended complaint contains counts for both intentional and negligent trespass, the plaintiff's brief draws no distinction between these two theories for purposes of her argument on this issue. As a result, neither do we. A defendant commits the tort of trespass by entering onto a plaintiff's land without permission, invitation, or other right. *Benno v. Central Lake County Joint Action Water Agency*, 242 Ill. App. 3d 306, 313 (1993). "One is subject to liability for an intentional intrusion on land irrespective of whether he causes harm to a legally protected interest." *Dial v. City of O'Fallon*, 81 Ill. 2d 548, 553 (1980) (citing Restatement (Second) of Torts § 158, at 277 (1965)). A plaintiff does not need to prove actual harm to recover damages for the intentional tort of trespass, as every trespass entitles the plaintiff to at least nominal damages. *Chicago Title Land Trust Co. v. JS II, LLC*, 2012 IL App (1st) 063420, ¶¶ 77, 88. Furthermore, a defendant can be liable in trespass not only for his own entry onto the plaintiff's land but also if he causes a thing or third person to enter onto it. *Dial*, 81 Ill. 2d at 554. It is a defense to an action for trespass that the defendant's entry was permitted by the terms of a valid and lawful contract. 87 C.J.S. *Trespass* § 49 (2021).

¶ 31　In this case, the defendants' position was that no trespass had occurred when Gonsalez and Centeno entered the plaintiff's property because of the provision in the mortgage giving Chase the right, if the plaintiff defaulted or there was a legal proceeding significantly affecting the lender's rights in the property, to "do and pay for whatever is necessary to protect the value of the Property and the Lender's rights in the Property." They contended that the contract specifically contemplated that such "actions may include *** entering on the Property to make repairs" but that the actual right granted is much broader than just the right to enter for the purpose of making repairs. They asserted that the foreclosure judgment order was a further basis of Chase's right of entry "to make such repairs to the real estate as may reasonably be deemed necessary for the proper preservation thereof." And they asserted that the supreme court had already made a specific finding based on the contract and judgment order "that Chase had the right to enter the property to make reasonable repairs for the preservation of the property." *Schweihs*, 2016 IL 120041, ¶¶ 57-58.

¶ 32　It is the plaintiff's position on appeal that, although the mortgage provision at issue allows the defendants to take steps actually necessary to preserve the property and to make reasonable

repairs, it does not give the defendants "unfettered access" to enter the mortgaged property regardless of the reason. The plaintiff points out that Gonsalez and Centeno were not sent to the plaintiff's house for the purpose of making repairs, and there is no evidence that any repairs were necessary to preserve the property as collateral. Instead, Gonsalez and Centeno were sent there for the purpose of changing the locks and winterizing it (in June), and thus, the plaintiff argues, the mortgage provision does not control.

¶ 33 The plaintiff contends that evidence of the policies and procedures of Chase and Fannie Mae were proper evidence that these companies did not interpret the mortgage provision at issue as providing an unfettered right, following default, to enter the property regardless of any need for repairs. The plaintiff asserts that these policies and procedures were designed to ensure that nobody entered the property without a right to do so, by providing that entry could be made only upon a finding of "abandonment" and by specifying procedures for determining whether a property had been "abandoned." Specifically, the plaintiff cites the provisions of the contract between Chase and Safeguard providing that (1) when Safeguard performs an inspection and "assesses the Property as abandoned," it shall promptly notify its property preservation department "to begin the property preservation process as described below," and (2) "[u]pon notification that the Property is abandoned *** [Safeguard] will assess the repairs or maintenance needed, and thereafter schedule the required work in accordance with the applicable Requirements." She argues that, according to this contract between Chase and Safeguard, there must be a finding of "abandonment" before the right to enter the property to make necessary repairs or take other property preservation measures is triggered, including changing the locks and winterizing a property. Thus, the plaintiff contends, the operative question in this trespass case is whether the plaintiff had "abandoned" her property and "not whether it was vacant, as Defendants found."

¶ 34 Based on the points discussed above, the plaintiff contends that she should have been allowed to put on evidence not just of the express language of the mortgage but also of the policies and procedures that reflected the defendants' interpretation of their own right to go onto the plaintiff's property and the way they balanced that right against the plaintiff's right to exclusive and uninterrupted use and enjoyment of her home during the redemption period. The plaintiff argues that she should have been allowed to put on evidence that the defendants violated the requirements of their own policies and procedures by their actions in this case and that a jury should have decided whether the parties' respective rights were balanced under the circumstances of this case.

¶ 35 The defendants respond that the trial court never found that the mortgage provision at issue gave them an "unfettered" right to go onto the property, as the plaintiff asserts. Instead, they argue, the trial court correctly ruled that their right to enter the plaintiff's property was governed by an express contractual provision and by the foreclosure judgment order and that, because their contractual right to enter was not qualified by the terms of any internal policies or procedures of the defendants or Fannie Mae, those policies and procedures were not relevant. They cite the principles that, "[w]here the law does not impose a duty, one will not generally be created by a defendant's rules or internal guidelines" (*Rhodes v. Illinois Central Gulf R.R.*, 172 Ill. 2d 213, 238 (1996)), and "[v]iolation of self-imposed rules or internal guidelines *** 'does not normally impose a legal duty, let alone constitute evidence of negligence.' " *Wade v. City of Chicago*, 364 Ill. App. 3d 773, 781 (2006) (quoting *Morton v. City of Chicago*, 286 Ill. App. 3d 444, 454 (1997)). They further argue it would be improper

- 10 -

to allow the plaintiff to use their internal policies or procedures to show the defendants' subjective understanding of express contract terms that are not shown to be ambiguous, and they argue that the plaintiff is not entitled to rely on the terms of their internal policies or procedures because the plaintiff was not a third-party beneficiary of the contract between Chase and Safeguard.

¶ 36    After carefully considering all of the parties' arguments on this issue, we conclude that the trial court did not err in determining that the internal policies and procedures of Chase, Safeguard, and Fannie Mae were inadmissible for the purpose for which the plaintiff sought to use them at trial. Specifically, we do not believe that the plaintiff could use these internal policies and procedures to argue or attempt to show that they established a duty or standard of care that the defendants had to comply with when entering the plaintiff's property to secure it or winterize it or that the reason the defendants committed a trespass was because they failed to comply with them. Allowing their use for this purpose would run afoul of the rule that a duty not otherwise imposed by law cannot be established by a defendant's internal policies and procedures. *Rhodes*, 172 Ill. 2d at 238.

¶ 37    We are dealing here with a cause of action for trespass, which, as stated above, is the entry onto the land of another without permission, invitation, or other right. *Benno*, 242 Ill. App. 3d at 313. "Generally, unlike a claim based in negligence, a trespass claim does not require proof of a legal duty or an applicable standard of care." 87 C.J.S. *Trespass* § 2 (2021). "It is immaterial whether or not the person committing the trespass is in the exercise of due care." (Internal quotation marks and emphasis omitted.) *Dial v. City of O'Fallon*, 75 Ill. App. 3d 782, 784 (1979), *aff'd*, 81 Ill. 2d 548 (1980). Thus, a plaintiff does not have to prove that a defendant's entry onto the plaintiff's land breached a particular legal duty or standard of care to establish a *prima facie* claim of trespass.

¶ 38    Rather, in this case, the appropriateness of the defendants' conduct in entering the plaintiff's property goes to the issue of "permission" or "other right" to enter, specifically whether their conduct was consistent with a contractual provision permitting entry. In arguing that they had a legal right to enter the plaintiff's property, the defendants relied upon a contractual provision that, in the event the plaintiff defaulted on her mortgage or there was a legal proceeding significantly affecting the lender's rights in the property, Chase or its agents "may do and pay for whatever is necessary to protect the value of the Property and the Lender's rights in the Property." This is a broad contractual right, and we agree with the defendants that it is broader than just the right of "entering on the Property to make repairs," which is simply one example given of what the lender's "actions may include." However, we also agree with the plaintiff that the provision at issue is not so broad as to give the defendants "unfettered access" to enter her property. We can hypothesize a variety of situations in which entry onto the plaintiff's land would appear to go beyond doing what is "necessary to protect the value of the Property and Lender's rights in the Property," for example by entering to perform nonemergency, routine work in the middle of the night.

¶ 39    The point, however, is that the ability of Chase or its agents to enter the plaintiff's property in the event of a mortgage default or a foreclosure lawsuit is a matter to which the parties have spoken by contract. Their duties to one another in this regard are therefore defined by the terms of that contract. Where defendants are charged with tortious conduct because of their failure to perform acts allegedly required by a contract, the question of whether the defendants had a duty to perform those acts must be determined by the terms of the contract itself. *St. Paul*

- 11 -

*Mercury Insurance v. Aargus Security Systems, Inc.*, 2013 IL App (1st) 120784, ¶ 60. The scope of the defendants' duties may not be expanded beyond what is required by the contract. *Id.*

¶ 40 Because the rights and duties of Chase or its agents in entering the plaintiff's property were controlled by the terms of the mortgage contract, we reject the argument that the internal policies and procedures of Chase, Safeguard, or Fannie Mae could serve as a basis for imposing additional or different duties on the defendants when entering the plaintiff's property. It is well-established in negligence cases that where the law does not impose a duty, one will not generally be created by a defendant's internal rules or guidelines. *Rhodes*, 172 Ill. 2d at 238; see also *Tafoya-Cruz v. Temperance Beer Co.*, 2020 IL App (1st) 190606, ¶¶ 72-77. This principle is no less applicable in cases where the parties' relationship is governed by a contract and the duties they owe to each other and controlled by the terms of that contract.

¶ 41 In *Fichtel v. Board of Directors of the River Shore of Naperville Condominium Ass'n*, 389 Ill. App. 3d 951, 953-54 (2009), the plaintiffs were condominium owners who brought claims of fraudulent concealment, breach of fiduciary duty, and negligence against their homeowner's insurance company for the failure of its investigator to disclose to the plaintiffs the fact that he had discovered mold in their attic while investigating a claim of water damage. The insurance contract between them provided that the insurer had the right, but not the obligation, to conduct investigations and report the results to the insured and that it did not make safety inspections or warrant that conditions were safe, healthful, or in compliance with laws, regulations, codes, or standards. *Id.* at 954-55. The trial court granted summary judgment in favor of the insurer on the basis that its duty to the plaintiffs was limited to the terms of the insurance contract between them, which did not include the duty to disclose the presence of the mold. *Id.* at 956. On appeal, the plaintiffs argued that the insurer owed them a duty beyond the terms of the contract because, when the insurer exercised its right to investigate, it assumed a duty to do so according to the standards of its internal operating guide, which provided that " '[e]vidence of mold should be noted and discussed with the insured' " and that the insured " 'should be advised of our investigative findings.' " *Id.* at 959. The court rejected the argument that a duty could be imposed based on the standards in the insurer's internal operating guide, relying in part on the principle that where the law does not impose a duty, one will not generally be created by a defendant's internal rules or guidelines. *Id.*

¶ 42 The same result is warranted in this case. The right of Chase or its agents to enter the plaintiff's property in certain situations is a matter of contract, and the terms of that contract must control the duties owed by Chase or its agents to the plaintiff in that regard. As was the case with the internal operating guide in *Fichtel*, here the internal policies and procedures of Chase, Safeguard, and Fannie Mae cannot be used to impose additional duties not set forth in the contract, or to alter or enlarge the existing duties as the contract defines them. These policies and procedures are not incorporated into the mortgage contract between Chase and the plaintiff. There is no indication here that the plaintiff relied upon them at the time when she entered into the mortgage or that their provisions are something she is entitled to enforce. It would similarly be impermissible to allow their use by the plaintiff as evidence of the defendants' own "understanding" of their duties under the mortgage contract, as evidence of a "standard of care" with which the defendants must comply in implementing their contractual duties or as extrinsic evidence that would allow the jury to resolve ambiguous language of the mortgage contract.

¶ 43    Based on our conclusion that the trial court was correct in barring the plaintiff from presenting evidence of the internal policies and procedures of Chase, Safeguard, and Fannie Mae, we turn to the plaintiff's argument that the trial court erred in dismissing the trespass claims with prejudice, which it did upon barring this evidence. On appeal, the plaintiff makes no argument that she could still have proven her trespass claims if evidence of the policies and procedures was barred. Rather, the plaintiff argues that the basis of the trial court's dismissal of her claims was its conclusion that the mortgage provision at issue gave the defendants an "unfettered" right to enter the plaintiff's property that was so extensive as to preclude a claim for trespass. The defendants contend that the plaintiff is overstating the trial court's actual ruling. They contend that the trial court's ruling was merely that their internal policies and procedures were not admissible as evidence of the duty or standard of care owed by the defendants in entering the plaintiff's property and it was the plaintiff's counsel who took the position that there was no trespass case to be tried if the policies and procedures were excluded as evidence.

¶ 44    Based on our review of the record, we agree that the plaintiff is mischaracterizing the trial court's ruling by stating that it interpreted the mortgage provision to allow Chase or its agents "unfettered" access to the plaintiff's property or to preclude a trespass claim as a matter of law. Instead, it appears that the plaintiff's counsel acquiesced to the dismissal after the trial court ruled that the internal policies and procedures of Chase, Safeguard, and Fannie Mae could not be used to prove the defendants had wrongfully implemented their right to enter the property.

¶ 45    After the trial court ruled that the policies and procedures were inadmissible, the court asked the plaintiff's counsel where that left the case for trespass. Counsel responded that nothing was left "since you're concluding that right was so extensive that there couldn't be a trespass, there's no trial." An extensive colloquy then followed, during which the trial court pressed the plaintiff's counsel multiple times about the fact that the plaintiff was not contesting that the contract gave the defendants a right to enter the property, that the case that the plaintiff's counsel wanted to try was the defendants' wrongful implementation of that right, and that his position was that he could not prove the case that he wanted to try if he was barred from using the policies and procedures. That colloquy concluded as follows:

> "THE COURT: The Court has said that there's—I'm not going to allow you to use the policies and procedures and to try before the jury the implementation of the right to enter. And because of that, all the parties have agreed, I think the record is clear, Mr. Joyce said that the contract gives you the right to enter. The Supreme Court said there was a right to enter. There's no trespass case. And I will enter judgment in favor of the defendant. ***

> MR. JOYCE [(PLAINTIFF'S COUNSEL)]: Just so it's clear, I'm agreeing that based on the contract, the mortgage—they have the right to enter. I'm totally disagreeing that that right is unfettered by a reasonable approach.

> But because I can't get in the documents that would go to what's reasonable, because you just said that's not appropriate, then there's nothing left to talk about. ***
> * * *

> MS. GOULD [(CHASE'S COUNSEL)]: So under the facts and circumstances of this case, is there a dispute over just looking to the contract language and not going beyond it that there's a trespass or not?

Because what I'm worried about is that he's suggesting maybe there is an issue that would go to the jury for this case that remains, and I just want to be clear that's not the case.

THE COURT: I think Mr. Joyce has made it clear—let me see if I can state it a different way—but because I have barred the use of the policies and procedures of Chase, Safeguard, Fannie Mae, that he has no evidence to present regarding the trespass issue because the evidence that he has is that Chase wrongly implemented their right to enter.

MR. JOYCE: And you've concluded, as a matter of law, they had the absolute right to go on the property and enter. So that's the basis for the motion.

* * *

THE COURT: *** Yes, because I have looked at the contract, Paragraph 7, where it says, ['e]ntering on the property to make repairs[,'] goes what the rights of the lender are, and one of them is entering the property to make repairs. It's not qualified by any rules, regulations, policies or procedures of Chase, Fannie Mae, or Safeguard. They have the right to enter to make repairs. And the Supreme Court has ruled that they had the right to enter the premises.

*So there's no trespass claim.*

MS. GOULD: Okay.

THE COURT: *Because I barred the evidence that he wants to present for his trespass claim.* So he's going to say, I'm wrong, those should have been allowed to proceed on the trespass claim." (Emphases added.)

¶ 46 Two days later, the parties returned for entry of the judgment order, and further discussion on the same matter occurred. During that discussion, the plaintiff's counsel again clarified his position that, while he disagreed with the trial court's ruling barring admission of the policies and procedures, "based on your ruling there is nothing left to try." The trial court also explained that the plaintiff's counsel was incorrect in characterizing its ruling as being that no trespass occurred as a matter of law because the defendants had the contractual right to go onto the plaintiff's land.

¶ 47 It is evident from the record that the plaintiff's counsel was clear about the fact that the trespass case he wanted to try involved using the internal policies and procedures to show that the defendants had wrongfully or unreasonably implemented their contractual right to enter the plaintiff's house. And, while the plaintiff's counsel disagreed with the trial court's rulings barring admission of the policies and procedures for this purpose, counsel accepted the consequences of that ruling for the case as he wanted to try it. During the discussion, the trial court gave the plaintiff's counsel multiple opportunities to avoid dismissal and proceed to attempt to prove a trespass claim without using the policies and procedures. However, the plaintiff's counsel declined the opportunity to proceed if he could not put on the case in the way he believed was appropriate.

¶ 48 We thus reject the plaintiff's characterization that the trial court dismissed the case because it concluded that the mortgage provision at issue gave the defendants an "unfettered" right to enter the plaintiff's property or that the right was so extensive as to preclude a claim for trespass as a matter of law. As stated above, we do not interpret that provision to give Chase or its agents an "unfettered" right to enter the plaintiff's property, and our review of the record does

not indicate that the trial court interpreted the provision this way either. The trial court specifically stated that this was not its ruling, and it explained that the reason "there's no trespass claim" was "[b]ecause I barred the evidence that [the plaintiff's counsel] wants to present for his trespass claim." Although there may have been ways in which the plaintiff could have gone to trial and attempted to prove a claim for trespass without using the policies and procedures, it is clear from the record that the plaintiff's counsel declined all opportunities offered by the trial court to do that. Thus, contrary to the plaintiff's assertion on appeal, the plaintiff was never prohibited from proceeding on the argument that the reasons the defendants entered the property (*i.e.*, to secure and winterize it) were beyond the scope of what was permitted by the mortgage provision itself. Likewise, the plaintiff far overstates the trial court's ruling by asserting that the trial court "excluded all evidence that Defendants entered Plaintiff's home on June 22, 2010, without notice, and without her invitation or permission, to change locks and winterize her home" and "excluded evidence that Defendants ignored all indicia that Plaintiff's home had not been abandoned." The plaintiff was never barred from using this evidence to attempt to prove a trespass claim but simply declined to do so after the trial court ruled that the policies and procedures were inadmissible.

¶ 49        Based on our conclusion that the trial court correctly determined that the policies and procedures were inadmissible for the purpose for which the plaintiff wanted to use them and the plaintiff's counsel's representation that without this evidence he could not establish the case for trespass that he wanted to try, we find no error in the trial court's dismissal of the plaintiff's trespass claims with prejudice. See *McMath v. Katholi*, 191 Ill. 2d 251, 255 (2000) (a party cannot complain of error which he induced to the court to make or to which he consented). Based upon this determination that the counts for trespass were properly dismissed, we have no reason to consider the issues involving the elements of damages that would have been warranted on those claims.

¶ 50                                    Assault Claim
¶ 51        The plaintiff's next argument on appeal is that the trial court erred in dismissing the claim for assault pled in the third amended complaint. The trial court's basis for dismissing the assault claim was its finding that the claim was barred by the doctrine of *res judicata*. The plaintiff argues that the doctrine of *res judicata* is inapplicable in this case because there has been no final judgment on the merits or an attempt to split claims into more than one lawsuit. Instead, the plaintiff points out that she was allowed to take an appeal under Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) of the order granting summary judgment on her claims for intentional infliction of emotional distress and nuisance and dismissing her claim for negligent infliction of emotional distress, and upon remand the trial court granted her leave to amend her complaint to add a claim for assault. Thus, she argues, this is not a circumstance in which *res judicata* applies.

¶ 52        After first denying the motion to dismiss, on reconsideration the trial court dismissed the plaintiff's assault claim pursuant to section 2-619 of the Code of Civil Procedure. 735 ILCS 5/2-619 (West 2018). Our review of the dismissal of an action under section 2-619 is *de novo*. *Richter v. Prairie Farms Dairy, Inc.*, 2016 IL 119518, ¶ 18. Section 2-619(a)(4), which allows for dismissal where a "cause of action is barred by a prior judgment" (735 ILCS 5/2-619(a)(4) (West 2018)), contemplates dismissal where an action is barred by the doctrine of *res judicata*. *Richter*, 2016 IL 119518, ¶ 20. "*Res judicata* bars a second adjudication of the parties' disputes

where there has been or could have been a former adjudication on the merits and there is an identity of cause of action and parties or their privies in the two lawsuits." *Lehman v. Continental Health Care, Ltd.*, 240 Ill. App. 3d 795, 801 (1992). It is an equitable doctrine designed to prevent *multiple lawsuits* between the same parties where the facts and issues are the same. *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 44. The three requirements that must be satisfied for *res judicata* to apply are (1) the rendition of a final judgment on the merits by a court of competent jurisdiction, (2) the existence of an identity of cause of action, and (3) identity of the parties or their privies. *Id.*

¶ 53    Although the parties' arguments focus primarily on the question of whether the order appealed under Rule 304(a) was a "final" judgment for purposes of *res judicata*, it appears to us that the more significant problem with applying the doctrine of *res judicata* is that all of the plaintiff's claims against the defendants have been presented within the context of a single lawsuit. The defendants' briefs make no response to the plaintiff's assertion that *res judicata* is inapplicable because she did not split her claims into separate lawsuits. Instead, they rely on the transactional test applied to determine whether an identity of cause of action exists, in which "separate claims are considered the same cause of action if they 'arise from a single group of operative facts, regardless of whether they assert different theories of relief.' " *A&R Janitorial v. Pepper Construction Co.*, 2018 IL 123220, ¶ 18 (quoting *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 311 (1998)). They assert that the emotional distress and nuisance claims involved in the Rule 304(a) appeal arose from the same group of operative facts as the assault claim that the trial court allowed the plaintiff to plead following remand.

¶ 54    In *Longo v. Globe Auto Recycling, Inc.*, 318 Ill. App. 3d 1028, 1037 (2001), this court held that the doctrine of *res judicata* was inapplicable because the requirement of an "identity of causes of action" did not exist where a plaintiff had not filed a second, separate lawsuit but instead sought relief in collateral proceedings in a single lawsuit. The same is true in this case. Here, the supreme court issued an opinion affirming dismissal of the count for negligent infliction of emotional distress and entry of summary judgment in defendants' favor on the count for intentional infliction of emotional distress, remanding the case to the trial court "for further proceedings consistent with this opinion." *Schweihs*, 2016 IL 120041, ¶ 65. Directions requiring a trial court to proceed consistent with the views expressed by the reviewing court in its opinion are general in nature. *Merrill v. Drazek*, 58 Ill. App. 3d 455, 458 (1978). Where a cause is remanded without particular instructions, a trial court is not precluded from thereafter allowing a plaintiff to amend a complaint and has the discretion to do so, provided the amendment is not inconsistent with the decision of the reviewing court. *Suburban Auto Rebuilders, Inc. v. Associated Tile Dealers Warehouse, Inc.*, 388 Ill. App. 3d 81, 95-96 (2009) (citing *Clemons v. Mechanical Devices Co.*, 202 Ill. 2d 344, 352-53 (2002), *Golf v. Henderson*, 376 Ill. App. 3d 271, 281 (2007), and *Merrill*, 58 Ill. App. 3d at 458).

¶ 55    Here, it was within the trial court's discretion following remand to allow the plaintiff to amend her complaint to plead a count for assault, as proceeding on such a claim is not inconsistent with the legal principles expressed in the supreme court's opinion. Although it may be true that the trespass, emotional distress, nuisance, and assault claims all arose from a single group of operative facts, the plaintiff has nevertheless presented them all within a single lawsuit. Thus, because there was only one lawsuit, the *res judicata* requirement of an identity of causes of action between two lawsuits is absent here. *Longo*, 318 Ill. App. 3d at 1037. Similarly, the policy concern of preventing multiple lawsuits between the same parties on the

same facts and issues is not present in this case. See *Lutkauskas*, 2015 IL 117090, ¶ 44. The trial court therefore erred in dismissing the count for assault on the basis of *res judicata*.

¶ 56    However, this does not end our inquiry involving the count for assault. Chase argues on appeal that even if the count for assault was not barred by *res judicata*, the trial court's judgment may be affirmed on any basis supported by the record (see *Jandeska v. Prairie International Trucks, Inc.*, 383 Ill. App. 3d 396, 398 (2008)), and the alternative bases Chase raised in its motion for summary judgment warrant judgment in its favor of the assault claim. Safeguard, Gonsalez, and Centeno have filed a cross-appeal in which they argue that, if this court finds the assault count was not barred by *res judicata*, then the trial court nevertheless erred in denying their two motions to dismiss and their summary judgment on the assault count. All of the defendants' motions for summary judgment asserted that they were entitled to summary judgment on the count for assault because there was no evidence that Gonsalez or Centeno acted with the intent required to commit the tort of assault. More specifically, they argued that there was no evidence that Gonsalez or Centeno intended to place the plaintiff in reasonable apprehension of receiving an immediate battery. Because we agree with this argument and find the issue to be dispositive, we address this argument first.

¶ 57    Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). The purpose of summary judgment is not to try an issue of fact but to determine whether one exists. *Monson v. City of Danville*, 2018 IL 122486, ¶ 12. A genuine issue of material fact precluding summary judgment exists where the material facts are disputed or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. In determining this question, the evidence in the record must be construed strictly against the parties moving for summary judgment and liberally in favor of the party opposing it. *Id.* A plaintiff seeking to defeat a motion for summary judgment does not need to prove her case, but she must present some factual basis that would arguably entitle her to a judgment. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12. This includes presenting some evidence to support each element of the plaintiff's cause of action. *Id.* This court reviews a trial court's summary judgment ruling *de novo*. *Monson*, 2018 IL 122486, ¶ 12.

¶ 58    Assault is an intentional tort. *Rosenberg v. Packerland Packing Co.*, 55 Ill. App. 3d 959, 963 (1977). "With respect to civil liability, an assault can be defined as an intentional, unlawful offer of corporal injury by force, or force unlawfully directed, under such circumstances as to create a well-founded fear of imminent peril, coupled with the apparent present ability to effectuate the attempt if not prevented." *Parrish v. Donahue*, 110 Ill. App. 3d 1081, 1083 (1982). Older cases hold that "[t]he intention to do harm is the essence of an assault." (Internal quotation marks omitted.) *Gilmore v. Fuller*, 198 Ill. 130, 143 (1902). The Restatement (Second) of Torts provides that establishing the tort of assault requires proof that the defendant acted with the intent to cause either a harmful or offensive contact with the plaintiff's person (or the person of a third party) or an imminent apprehension of such a contact. Restatement (Second) of Torts § 21(1) (1965). An action that is not done with this intent will not make the defendant liable to the plaintiff for an apprehension caused thereby, even if the defendant's act involves an unreasonable risk of causing it and therefore would be negligent or reckless if the risk threatened bodily harm. *Id.* § 21(2). " 'There is, properly speaking, no such thing as a

- 17 -

negligent assault.' " *Rosenberg*, 55 Ill. App. 3d at 963 (quoting Prosser and Keeton on the Law of Torts § 10, at 41 (W. Page Keeton *et al.* eds., 4th ed. 1971)).

¶ 59　　　The defendants argue that there is no evidence in this case with which the plaintiff can prove that Gonsalez or Centeno acted with the intent to cause the plaintiff an imminent apprehension of suffering harmful or offensive contact with her person (*i.e.*, a battery). Instead, they contend that the evidence shows that the two men went to great lengths to confirm that nobody was present at the plaintiff's house before they went inside it. They cite Gonsalez's deposition testimony that he was startled when he saw the plaintiff inside the house. They point to the plaintiff's deposition testimony that when she encountered the men and asked them why they were in her house, one of them responded that they had been sent by Chase to winterize the house and do some other work, and, when she instructed them to leave her house, they immediately did so. They further cite her testimony that neither of the men threatened her.

¶ 60　　　In response, the plaintiff argues that there is at least a question of fact about whether the defendants intended to place the plaintiff in apprehension of receiving an immediate battery. She cites to her testimony that although the men asked her to come outside with them, she was afraid to go outside into her fenced back yard with the two strange men she found inside her home. She asserts that their statement to her that Chase had sent them was not believable because neither man was dressed in a uniform, had a name tag, appeared to have been sent by Chase or any other professional company, or carried documentation reflecting an affiliation with Chase. Instead, she states, they were wearing "scruffy clothing, including cut-off shorts, an unbuttoned shirt with tattoos exposed, and had messy hair." She points to her testimony that the men looked strong and that one was blocking the opened doorway. She cites her testimony that she had no idea what the men, who had just broken through her locked back door and had no justifiable reason to be inside her house, could or would have done with her if she had exited the home with them into her back yard. She further relies on the following testimony from her deposition:

> "When you find two guys in your house, no papers, looking like they did \*\*\* [Gonsalez] had an open shirt with tattoos and muscles showing, he's moving a little bit. And I'm thinking am I gonna be attacked, beaten up, am I gonna be raped. What am I gonna do? I can't feel a way to get out of the situation. He was pretty close to me. I couldn't get to the front door fast enough, I couldn't get downstairs fast enough. I couldn't get to that other door with [Centeno] over there. \*\*\*
>
> \* \* \*
>
> [Gonsalez and Centeno] came through a big back gate, they broke through the storm door, they broke into the wooden door. They're in my house, they're approaching me. They're ordering me to go outside with them. Yeah, I see no escape out of there. I thought I could be raped or beaten up or killed or robbed. I didn't know what was gonna happen."

¶ 61　　　We agree with the defendants that the evidence relied upon by the plaintiff fails to demonstrate a genuine issue of material fact about whether Gonsalez or Centeno acted with the intent required to be liable for the tort of assault. Specifically, there is no evidence that either defendant acted with the intent to cause either (1) a harmful or offensive contact with the plaintiff's person or (2) an imminent apprehension of such contact. The evidence is undisputed that the two men conducted an investigation to determine that the house was vacant before entering it, and they entered it only after concluding, albeit mistakenly, that nobody was

inside. When the plaintiff asked the men to leave, they immediately did so. Neither the men's physical appearance nor the fact that Gonsalez was "moving a little bit" or was "approaching" the plaintiff constitute sufficient circumstantial evidence to justify the inference that their acts were intended to cause an immediate apprehension of harmful or offensive contact with the plaintiff's person. The evidence relied upon by the plaintiff shows, at most, that she apprehended being personally injured by the defendants' presence in her house, but proof of such apprehension without proof that the defendants intended to cause it is insufficient to impose liability for the tort of assault. Restatement (Second) of Torts § 21(2) (1965).

¶ 62 As the plaintiff failed to demonstrate the existence of a genuine issue of material fact on an essential element of her assault claim, summary judgment in favor of all defendants is appropriate on count IV of the plaintiff's third amended complaint. Because this issue is dispositive of the plaintiff's claim for assault, no reason exists to address any other issues raised in the defendants' cross-appeal.

¶ 63 CONCLUSION

¶ 64 For the reasons discussed above, the judgment of the trial court is affirmed.

¶ 65 Affirmed.