2022 IL App (1st) 210660-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
May 31, 2022

No. 1-21-0660

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| The BANK OF NEW YORK MELLON FKA The Bank of New York, as Trustee for the Certificateholders of The CWALT, Inc., Alternative Loan Trust 2006-OA21 Mortgage Pass-Through Certificates, Series 2006-OA21, | ) ) ) ) ) | |
| Plaintiff and Counterdefendant-Appellee, | ) ) ) | Appeal from the Circuit Court of Cook County |
| v. | ) ) ) | No. 12 CH 4723 |
| ANTONI FIORENTINO, UNKNOWN HEIRS AND LEGATEES of Antoni Fiorentino, if any, UNKNOWN OWNERS and NONRECORD CLAIMANTS, | ) ) ) ) | The Honorable Darryl B. Simko, Judge Presiding. |
| Defendants | ) ) | |
| (Antoni Fiorentino, Defendant and Counterplaintiff-Appellant). | ) ) | |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* Trial court's determination that borrower's monthly mortgage payment under loan modification agreement included an escrow obligation is affirmed. Judgment in bench trial that borrower had failed to prove counterclaim for breach of contract was not against the manifest weight of evidence. Summary judgment in favor of lender on grounds that the alleged conduct was not actionable as a consumer fraud claim is affirmed.

¶ 2      The defendant and counterplaintiff, Antoni Fiorentino (Fiorentino), appeals from a bench trial judgment against him and in favor of the plaintiff and counterdefendant, The Bank of New York Mellon FKA The Bank of New York, as Trustee for the Certificateholders of The CWALT, Inc., Alternative Loan Trust 2006-OA21 Mortgage Pass-Through Certificates, Series 2006-OA21 (Lender), on the Lender's complaint to foreclose a mortgage and on Fiorentino's counterclaim for breach of contract. Fiorentino also appeals the trial court's order granting summary judgment in favor of the Lender on his counterclaim alleging violations of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 2014)). We affirm.

¶ 3                                 I. BACKGROUND

¶ 4      On February 10, 2012, the Lender filed an action to foreclose Fiorentino's mortgage on a residential building at 1229 West Flournoy Street in Chicago. Fiorentino filed an amended answer, affirmative defenses, and counterclaims alleging, *inter alia*, that the Lender had violated the Consumer Fraud Act by various actions that it and its mortgage service provider (Bank of America) had taken following a loan modification in May 2010, including misapplying payments, creating an escrow account not called for by the modification, improperly force-placing hazard insurance that already existed and then refusing to credit Fiorentino's account, and ignoring requests for accurate account statements. Fiorentino later filed a second amended version of that pleading, realleging the affirmative defense and counterclaim under the Consumer Fraud Act and adding a counterclaim for breach of contract concerning substantially the same acts. The trial court eventually granted summary judgment in favor of the Lender on the counterclaim and affirmative defense under the Consumer Fraud Act. The case proceeded to bench trial on the Lender's action to foreclose the mortgage and Fiorentino's counterclaim for breach of contract.

¶ 5      Much of the evidence at the bench trial was undisputed. Two witnesses testified, Fiorentino

and Nathan Musick, a customer resolution associate and assistant vice president employed by Bank of America. Bank of America and various of its subsidiaries were, at the time relevant to this appeal, the mortgage servicer on behalf of the Lender for Fiorentino's mortgage. The evidence showed that Fiorentino originally entered into a mortgage and promissory note with Countrywide Bank in 2006, which was later transferred to the Lender. The mortgage contract imposed on Fiorentino an obligation to advance funds for escrow items (property taxes, insurance premiums, etc.) as part of his monthly payment, but it allowed this requirement to be waived. Accordingly, in 2006 when he entered into the mortgage, Fiorentino also signed an escrow waiver agreement with Countrywide Bank requiring him to pay directly all escrow items and providing that if he failed to pay an escrow item prior to its delinquency date, "my lender may rescind this escrow waiver without notice and enforce the escrow account provision set forth in my loan documents."

¶ 6     It is undisputed that by at least August 2008, Fiorentino had failed to make property tax payments. Bank of America paid those taxes, and it sought recoupment by adding an escrow component to Fiorentino's regular monthly mortgage payment. In the year prior to May 2010, the escrow component of Fiorentino's monthly mortgage payment was $778.53 per month.

¶ 7     In 2009, Fiorentino proactively reached out to Bank of America about lowering his monthly mortgage obligation due to challenges he foresaw in his future ability to make his monthly payment. This ultimately culminated in a loan modification agreement the following year. However, several events significant to the parties' dispute occurred in the meantime.

¶ 8     In January 2010, Bank of America informed Fiorentino that it did not have evidence of hazard insurance in place on his property and that such insurance would be purchased for $10,401 at his expense if he did not provide evidence that it was already in place. Such insurance was in fact in place, but nevertheless, in April 2010, Bank of America purchased and force-placed a hazard

insurance policy for the property, and it added $10,401 to Fiorentino's escrow account balance. However, on May 6, 2010, Bank of America sent Fiorentino a letter confirming that the insurance it had purchased at his expense had been cancelled with no charge to him. According to a ledger introduced at trial by Bank of America, a credit of $10,401 was added to Fiorentino's escrow account on May 7, 2010. Fiorentino testified that based on subsequent communications, he doubted that the credit had actually been made at that time. Musick testified that this credit was added to his account that day. Musick also testified that, after receiving this credit on May 7, 2010, the balance Fiorentino owed to Bank of America on his escrow account was $6031.71.

¶ 9        The trial court took judicial notice that in March 2010, a separate foreclosure action was filed against Fiorentino by the Lender. According to Musick's testimony, the filing of this action resulted in various attorney fees and expenses being added to Fiorentino's account at that time.

¶ 10        In correspondence dated March 29, 2010, Bank of America offered Fiorentino a loan modification agreement that would roll $28,297.43 in delinquent payments into the principal of his loan and "result in a new monthly payment amount of $2,312.31" to take effect on April 1, 2010. A footnote stated, "This payment is subject to change if your escrow payment changes." The cover letter indicated that Fiorentino had a "past due amount of $35,365.84," but only $28,297.43 was being rolled into the principal. That latter amount comprised $27,699.27 in past due interest, $598.16 in fees, and $0 in escrow. It also included a section explaining how the new monthly payment amount of $2312.31 had been calculated. Below that calculation was a sentence stating, "If you have an escrow account, this notice does not address any changes to your escrow payment. Please refer to your monthly statement for information regarding your current escrow payment."

¶ 11        The loan modification agreement itself provided that it was amending and supplementing the mortgage contract and promissory note. It stated, "As of May 1, 2010 the scheduled monthly

payment will be in the amount of U.S. $2,312.31." It then provided for ten years of interest-only payments, with the interest rate progressively increasing on April 1 of each subsequent year and principal-and-interest payments commencing on April 1, 2020. It also contained a sentence reflecting the borrower's understanding "that the New Monthly Payment will be the minimum payment that will be due each month (excluding Escrow Items) for the remaining term of the loan."

¶ 12    Fiorentino testified at trial that his understanding was that all past unpaid escrow payments had been rolled into the principal as part of the modification and that $2312.31 was his binding monthly payment until Bank of America sent him a notice saying otherwise. He testified that he did not believe that property taxes were escrowed under the loan modification agreement because the first installment of taxes had been paid prior to the modification, all payments in arrears were being rolled into the principal balance, and the second installment payment would not be due until later in the year. Thus, he assumed there was no longer an escrow obligation on the account, consistent with how it had been at the beginning of his loan. He also testified that he planned to make the upcoming tax payments. He further testified that he did not think he was escrowing insurance premiums under the loan modification. He testified that he had always paid his own homeowner's insurance since the inception of the loan in 2006. He testified, however, that he had not paid property taxes directly since 2008 and that this was the case through the time of trial.

¶ 13    On April 28, 2010, Bank of America sent an annual escrow statement stating that "the escrow portion of your payment is changing to $3,006.13 effective June 2010." It contained an explanation of how this figure had been determined. The figure was based upon a projection that Bank of America would make future property tax installment payments of $4727.30 in August 2010 and $4961.18 in February 2011 and a hazard insurance premium payment of $10,401 in January 2011. It also included a "[s]hortage payment" of $1054.09 per month to keep the balance of his escrow

account from falling below zero during the year. It reflected a beginning escrow account balance of negative $7626.63. Fiorentino testified that he did not believe he owed $3006.13 as his escrow obligation. He testified that he made a phone call to Bank of America about this.

¶ 14    Prior to May 1, 2010, Fiorentino sent what he intended to be his first monthly payment under the new loan modification agreement (May 2010 payment) in the amount of $2500. He submitted that amount with the intent of covering his required $2312.31 interest-only payment, with the remainder to be applied to principal. However, the evidence showed that Bank of America did not apply this payment to interest or principal at that time. Instead, Musick testified that there were attorney fees, fines, and other expenses that had been added to the balance of Fiorentino's loan, stemming from the prior foreclosure action that had been filed in March 2010, which were in excess of $2500. Thus, Fiorentino's payment in May 2010 had been applied to those fees. (Musick testified that Bank of America later reversed the application of this $2500 payment to fees and applied it to a later interest and escrow payment, but this did not occur until January 2011.)

¶ 15    Prior to June 1, 2010, Fiorentino made what he intended to be his second monthly payment (June 2010 payment) for $2400. Musick testified that when Bank of America received this payment, it was applied to a suspense account because it was "less than a regular payment amount." Musick testified that Fiorentino's "regular payment amount" at that time was $3090.84, which consisted of an interest portion of $2312.31 plus an escrow portion of $778.53. Musick testified that when Bank of America receives a payment that is less than a regular payment amount, it is placed into an "unapplied" or "suspense" account until that account contains sufficient funds to make a full regular monthly payment. He testified that a payment for less than a regular payment amount can also be applied to late charges and fees according to the security documents. At the time, Fiorentino was unaware of how these payments had been applied to his loan.

¶ 16    Musick also testified that it was not until June 22, 2010, that the loan modification was fully booked and implemented within Bank of America's computer system. Musick testified that this delay was due to the fact that it was not until June that Fiorentino had sent in the current paycheck stubs and bank statements that Bank of America had requested to approve the modification.

¶ 17    On June 29, 2010, Bank of America sent Fiorentino a monthly statement reflecting a "Principal and/or Interest Payment" of $2312.31 and a "Total Payment Amount" of $5318.44. (This was a difference of $3006.13, consistent with the escrow amount on the statement of April 28, 2010.) However, it also reflected a past-due payment amount of $8409. That notice also stated, "If you and [Bank of America] have entered into an agreement to address your monthly payments, please make payments in accordance with this agreement." Upon receiving this statement, Fiorentino contacted Bank of America because he believed the escrow numbers were still incorrect and continuing to reflect the force-placed hazard insurance purchased by Bank of America. He was also concerned about the past-due payment amount shown, since he had made two payments under the loan modification agreement by this time. He was concerned by this time that Bank of America had not gotten the modification completed through all of its departments.

¶ 18    On July 14, 2010, Bank of America sent Fiorentino a notice that he was in default, due to the failure to make required payments, and that it intended to accelerate his mortgage. That notice set forth two monthly charges, $3090.84 due May 1, 2010, and $10,636.88 due June 1, 2010. It also reflected $231.34 in late charges, $87.16 in uncollected costs, $2998.16 held as a partial payment balance, and $11,047.96 as the total he owed. Fiorentino described receiving this notice as the "spark" that cause him to think something was incorrect about how the loan modification had taken place and to question whether his prior payments had been properly credited to his loan. The amount of the monthly charge owed for June also caused him to question whether Bank of America

had properly credited the $10,401 in force-placed hazard insurance back to him.

¶ 19    Fiorentino testified that he looked at Bank of America's online portal and could not see how his prior payments had been applied to his loan. He testified that he called Bank of America "so many times I couldn't count," but he could not get anyone to give him a clear answer about why the past-due amounts were still reflected on his account and why it did not appear that his May and June 2010 payments had been credited to his loan. He testified that when he would call Bank of America and tell them that there was a payment missing from May 2010, "a lot of times they would just act like they didn't understand what I was talking about. *** [I]t would look like I'm confused talking to them because they didn't have the information of that payment either." He also went in person to Bank of America branches to try to get answers.

¶ 20    After this time, the evidence showed a continuing pattern in which Fiorentino would submit monthly payments, which varied in amount but were always at least $2312.31. Thereafter, he would receive a notice from Bank of America stating that he was in default on his mortgage obligations by varying amounts in excess of several thousand dollars and that he had incurred new late charges. He would then contact Bank of America in an attempt to resolve the discrepancy without avail. However, on August 27, 2010, he began making monthly payments in the amount of $3090.84, and he continued paying this amount for several months. He testified that the reason he made payments in this amount was because he had gone to a Bank of America branch and, upon having a conversation there, it became clear to him that $3090.84 was the amount of the payment "that the computer system wanted." He testified that the reason he later changed to paying a lower amount was because he wanted the excess applied to principal, but Bank of America was not doing this. Instead, it was "reversing fees, putting the payment in, backing it out, breaking it into pieces." He testified that, as he continued to receive notices of default into the fall of 2010, his concern was

that the May 2010 payment had been lost and that this was causing late fees to continually accumulate on his account, putting him further into arrears. He also believed that Bank of America recognized its mistake in failing to roll the escrow balance that had been outstanding as of April 2010 into the principal in his loan modification, and he thought eventually this would be corrected.

¶ 21     The final notice of default and intent to accelerate the mortgage in this case was sent to Fiorentino on January 11, 2011. The evidence showed that thereafter he continued to make monthly payments through at least October 31, 2011. On December 20, 2011, Bank of America sent him a notice that it was returning funds to him in the amount of $3508.80 for the reason that the "amount remitted does not represent the total due." A notation in Bank of America's phone call logs from that time reflects that Bank of America communicated to him that a foreclosure was in process. The instant foreclosure suit was then filed on February 10, 2012.

¶ 22     Musick testified in detail, with reference to the ledger for Fiorentino's account, about how Bank of America had applied each of Fiorentino's mortgage payments between May 2010 and October 2011. Only a few of these payment applications are truly pertinent to this appeal. As stated above, Musick testified that the May 2010 payment for $2500 was initially applied to attorney fees and costs on his account, stemming from the prior foreclosure action that had been filed in March 2010. However, on January 10, 2011, Bank of America reversed that application and instead, after combining it with other funds held in the suspense account at that time, reapplied that $2500 to the regular monthly interest and escrow charges due for September 2010, which was then the most delinquent payment. Musick testified that the original application of the payment to fees had been proper under the mortgage contract, but Bank of America's adjustment of the application of that $2500 in January 2011 was done as "kind of a gratuity here, trying to help him out."

¶ 23     Musick also testified that the June 2010 payment for $2400 was applied to the suspense

account, because it was less than a regular monthly payment due. Musick did not testify about how this money was eventually withdrawn from the suspense account and applied, but the account ledger in evidence indicates it was held in the suspense account until September 29, 2010, when it was applied toward the then-outstanding escrow balance of $3599.27. In the meantime, two payments, one for $2500 on June 30, 2010, and one for $3000 on July 25, 2010, were combined and applied toward the regular monthly payment of $3090.84 for May 2010, and $2409.16 of the payment due for June 2010. Also, the two payments that followed were both for $3090.84, made on August 27, 2010, and September 16, 2010; because these were full monthly payments, they were applied as the regular monthly payments for July 2010 and August 2010, respectively.

¶ 24     Thereafter, Musick continued to go through each of Fiorentino's payments through October 31, 2011, and he explained how each was applied. We need not go through this testimony in detail. In summary, his testimony showed that most of Fiorentino's monthly payments were for amounts less than a regular monthly payment of interest and escrow. When Bank of America would receive such a payment, it would be applied to the suspense account and sometimes to late charges. When sufficient funds had accumulated in the suspense account to make a regular monthly payment, then such funds would be withdrawn from the suspense account and applied to make the monthly payment for the most delinquent month. On a few occasions, the funds were returned to Fiorentino. He also testified that, on February 9, 2011, Bank of America paid $1501 for hazard insurance, and this amount was added to the escrow balance. Musick testified that Fiorentino did not by February 10, 2011, pay the amount of $11,008.98 stated as necessary to cure the default in the final notice and intent to accelerate sent to Fiorentino on January 11, 2011.

¶ 25     On cross-examination, Musick testified that he was unaware if any conversation had occurred with Fiorentino at the time of his loan modification informing him of what he was required to pay

as an escrow payment. He testified that he had requested the statements that had been sent to Fiorentino in April and May 2010, but Bank of America no longer had records prior to 2011 or 2012. He testified that he did not know how the monthly charge of $10,636.88 for June 2010 was reflected on the notice of default and intent to accelerate sent on July 14, 2010. He was likewise unable to give an explanation of how Bank of America had determined various other amounts stated on later notices of default that it sent in subsequent months. He was not aware of any document informing Fiorentino of an increase in his escrow payment around September 2010.

¶ 26    Following the conclusion of testimony, the parties submitted written closing arguments. The trial court then entered a written order in which it found that Fiorentino had failed to prove a breach of the loan modification agreement. It entered judgment in favor of the Lender and against Fiorentino on both the complaint to foreclose the mortgage and on Fiorentino's counterclaim. Fiorentino then filed a motion to reconsider that judgment, which the trial court denied. The trial court made express findings pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) that there was no just reason for delaying the enforcement or appeal of its judgment order, its order denying the motion to reconsider, and its order granting summary judgment on the Consumer Fraud Act claims. This appeal then followed.

¶ 27                                    II. ANALYSIS

¶ 28                            A. Bench Trial Judgment

¶ 29    Fiorentino's first two arguments on appeal challenge the judgment of the trial court following the bench trial, based in part on its interpretation of the loan modification agreement. The standard of review following a bench trial is whether the trial court's order or judgment is against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12. A judgment is against the manifest weight of the evidence only when the findings appear to be

unreasonable, arbitrary, or not based on evidence or when an opposite conclusion is apparent. *Vaughn v. City of Carbondale*, 2016 IL 119181, ¶ 23. Under this standard of review, the appellate court gives deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses and achieves a degree of familiarity with the evidence that a reviewing court cannot possibly obtain. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). The appellate court therefore does not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to evidence, or the inferences to be drawn. *Id.* at 499. Accordingly, the trial court's judgment will be affirmed provided the record contains any evidence supporting it. *In re Estate of Wilson*, 238 Ill. 2d 519, 570 (2010).

¶ 30        However, to the extent that issues in a bench trial involve the interpretation of contracts, such rulings are conclusions of law that the appellate court reviews *de novo*. *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002); see also *International Supply Co. v. Campbell*, 391 Ill. App. 3d 439, 448-49 (2009). Factual findings pertaining to the interpretation of that contract are given deference on review and are subject to reversal only when they are against the manifest weight of the evidence. *Asset Recovery Contracting, LLC v. Walsh Construction Co.*, 2012 IL App (1st) 101226, ¶ 74. The primary goal of contract interpretation is to give effect to the parties' intent by interpreting the contract as a whole and applying the plain and ordinary meaning to unambiguous terms. *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 382 Ill. App. 3d 632, 636-37 (2008).

¶ 31                              1. Monthly payment obligation

¶ 32        Fiorentino's first argument is that the trial court incorrectly interpreted the loan modification agreement to require a monthly payment that included an escrow obligation in addition to the amount required to cover the interest portion of his interest-only loan. In support of his argument, he relies on the provision of the loan modification agreement stating that, "[a]s of May 1, 2010 the

scheduled monthly payment will be in the amount of U.S. $2,312.31." Fiorentino asserts that the loan modification agreement states nothing about an escrow for taxes or insurance being required in addition to the stated amount. He argues that the loan modification agreement thus unambiguously requires payments of only $2312.31 for the year commencing May 1, 2010, that the uncontradicted evidence showed he made payments of at least that amount until Bank of America stopped accepting his payments in late 2011, and that Bank of America therefore breached the loan modification agreement and mortgage contract by rejecting his payments and filing this foreclosure action.

¶ 33　　　　In its judgment order, the trial court found that Fiorentino's monthly payment due beginning May 1, 2010, was $3090.84 ($2312.31 for interest plus $778.53 for the property tax escrow).[1] The trial court reasoned that, under the escrow waiver agreement that Fiorentino had signed in 2006, the lender had the right to rescind the waiver and enforce " 'without notice' " the escrow provisions of the mortgage contract if Fiorentino failed to pay the escrow items himself. The trial court noted that Fiorentino had not been paying property taxes directly since 2008 and that Bank of America had been escrowing a portion of his monthly payments since that time, after it had begun paying those property taxes on his behalf. The trial court further noted that when the proposed loan modification agreement was sent to Fiorentino in 2010, it was accompanied by a four-page notice that showed how the new monthly payment amount of $2312.31 was being calculated, indicated that it consisted only of interest, and advised that it did not " 'address any changes' " to any escrow payment obligation that Fiorentino might have.

¶ 34　　　　We agree with the trial court that the loan modification agreement provided for Fiorentino's

---

[1] The trial court's order states that $788.53 was escrowed for property taxes, but the evidence indicates that the amount was $778.53 as of May 1, 2010.

monthly payment to include an escrow obligation in addition to the $2312.31 obligation for interest for the period commencing May 1, 2010. Initially, we disagree with Fiorentino's contention that the loan modification agreement states nothing about escrows being required in addition to the stated amount. Rather, the loan modification agreement itself includes a provision reciting that the borrower understands "that the New Monthly Payment will be the minimum payment that will be due each month (excluding Escrow Items) for the remaining term of the loan." This language is consistent with a contractual intent that $2312.31 was only the minimum amount Fiorentino needed to pay, and an additional amount for escrow items was due in addition to that sum.

¶ 35      The loan modification agreement itself stated that it "amends and supplements" the original mortgage contract and promissory note. Thus, we interpret these documents together as part of a single contract comprising the terms of the original mortgage contract and promissory note that the parties have not agreed to change, along with the new terms to which they have agreed in the loan modification agreement. *Id.* at 637. Although the loan modification agreement does not mention an escrow obligation, section 3 of the mortgage contract requires that Fiorentino "shall pay to Lender on the day Periodic Payments are due *** a sum *** to provide for the payment of amounts due for," *inter alia*, "taxes" and "premiums for any and all insurance required by the Lender." Although the evidence showed that this escrow obligation had initially been waived in 2006, Fiorentino also signed an agreement at that time providing that if he failed to meet his obligations of paying the taxes and insurance premiums otherwise subject to escrow, that waiver could be rescinded "without notice" and "the escrow account provisions set forth in my loan documents" could be enforced. The evidence showed that this occurred in 2008, when Fiorentino stopped making direct payments of property taxes. Bank of America then began paying those taxes and added an escrow obligation to Fiorentino's monthly mortgage payment, which for the year

prior to May 2010 was $778.53 per month. Thus, Fiorentino had an escrow obligation under section 3 of the mortgage contract at the time he entered into the loan modification agreement in 2010. Nothing in the loan modification agreement amended, supplemented, or otherwise changed the existing escrow obligation under section 3 of the mortgage contract.

¶ 36    Although we find that the contractual language alone is determinative, the intent that Fiorentino's escrow obligation continued to exist in addition to his new monthly interest payment is further demonstrated by the cover letter or notice that accompanied the proposed loan modification agreement. That notice stated that the enclosed modification agreement will "result in a new monthly payment amount of $2,312.31." A footnote to that sentence stated, "This payment is subject to change if your escrow payment changes." The notice also explained how Bank of America had calculated the new monthly payment of $2312.31 and referred to that sum as the "New Interest Payment." Directly following that were sentences stating, "If you have an escrow account, this notice does not address any changes to your escrow payment. Please refer to your monthly statement for information regarding your current escrow payment." These statements in the notice are consistent with an intent and understanding that the sum of $2312.31 was only the amount due for interest and that an escrow obligation continued to exist in addition to that interest obligation.

¶ 37    Also consistent with an intent that Fiorentino's monthly mortgage payment after May 2010 included an escrow is the annual escrow statement dated April 28, 2010, in which Bank of America advised him that "the escrow portion of your payment" was changing to $3006.13 in June 2010. It showed how that amount was determined, which was based upon the projection that Bank of America would make future property tax installment payments in August 2010 and February 2011 and a hazard insurance premium payment in January 2011. It also included an amount to cover the

shortage in the escrow account over a 12-month period. At trial, there was little evidence presented concerning the projected payments that gave rise to the calculation of this amount, although the evidence clearly showed that Fiorentino disputed the accuracy of this amount and that Bank of America thereafter considered his monthly escrow obligation to be only $778.53, the same as it had had the preceding year. However, there is simply no support in either the contract or the evidence for the notion that Fiorentino's escrow obligation was $0 or that it did not include at least the amount of property taxes projected to be paid by Bank of America in the year ahead.

¶ 38        Accordingly, we affirm the trial court's determination that the loan modification agreement and mortgage contract imposed an escrow obligation in addition to the monthly interest payment of $2312.31, for the period commencing May 1, 2010. The trial court's finding that such monthly escrow obligation was $778.53, as it had been the previous year, was supported by the evidence. As this resulted in a total monthly payment amount of $3090.84 for this period, the trial court's determination that this was the monthly payment required under Fiorentino's mortgage was not against the manifest weight of the evidence.

¶ 39                    2. Judgment against manifest weight of evidence

¶ 40                    *a. Application of May and June 2010 payments*

¶ 41        Fiorentino next argues that the trial court's judgment on his counterclaim for breach of contract was against the manifest weight of the evidence. He argues that the loan modification agreement and underlying mortgage contract were breached when Bank of America failed to apply his payments correctly, failed to send monthly statements, and failed to send escrow statements. He further argues the totality of the evidence supported a judgment in his favor, and the trial court's finding that he had breached those same contracts was against the manifest weight of the evidence.

¶ 42        Fiorentino's argument that Bank of America failed to apply his payments correctly involves

the May 2010 payment of $2500 and the June 2010 payment of $2400. He cites the fact that, shortly after he made these payments, Bank of America sent him the statement dated June 29, 2010, indicating that his interest payment was $2312.31, that his total payment due was $5312.44, and that he had a negative escrow balance of $6031.71, a past due amount of $8409, fees due of $87, and a partial payment balance of $2998.16. That notice also directed him, if he and Bank of America had entered into an agreement to modify monthly payments, to "make payments in accordance with this agreement." The cover letter of that agreement, he points out, directed him to "refer to your monthly statement for information regarding your current escrow payments." He contends that these statements in these two documents amounted to a "circular reference," creating confusion about exactly how much he owed. He also cites the notice of default and intent to accelerate dated July 14, 2010, which again indicated that he owed $3090.84 in monthly charges for May and $10,636.88 in monthly charges for June, plus late fees. He argues that, despite checking the online portal, making numerous phone calls, and visiting bank branches in person, nobody from Bank of America could tell him what was going on at the time. He states that it was not until after this lawsuit was filed and a Bank of America representative gave a deposition that he learned the May 2010 payment had been applied to attorney fees. He cites the fact that this information was never made available to him at that time, and therefore nobody could tell him what had happened to his May 2010 payment.

¶ 43     The trial court's conclusion that Fiorentino failed to prove that this was a breach of contract is not contrary to the manifest weight of the evidence. Fatal to Fiorentino's argument on appeal is his complete failure to cite us to any specific contractual provision or term that he contends was breached by Bank of America's conduct here. Our own review of the mortgage contract and promissory note reveal several provisions, including section 14 of the mortgage contract and

section 7(E) of the promissory note, that allow, in the event of a borrower's default, expenses such as attorney fees, property inspection fees, and other expenses and costs pertaining to the default to be charged to the borrower's account. The evidence at trial was that, when Bank of America first received Fiorentino's May 2010 payment of $2500, it applied the payment to the reimbursement of attorney fees and expenses stemming from the prior foreclosure action that had been filed against Fiorentino in March 2010. Application of the funds in this manner appears to be consistent with the contract, and Fiorentino cites no contract provision that required his May 2010 payment to be applied in a different manner.

¶ 44       As for his June 2010 payment for $2400, Fiorentino argues that the trial court erred in finding that this payment was properly applied to the suspense account. We reject this argument. As discussed above, the evidence showed that the regular monthly payment due at that time was $3090.84. Because the payment of $2400 was less than a regular monthly payment of $3090.84, it was insufficient to bring the loan current and thus properly held in the suspense account under section 1 of the mortgage contract. That section provides that the lender is not required to accept a payment that is "insufficient to bring the Loan current." The lender "may" accept such a payment, "but Lender is not obligated to apply such payments at the time such payment is accepted." Instead, "Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower." Thus, application of the June 2010 payment to the suspense account was permissible under section 1 of the mortgage contract.

¶ 45       Fiorentino goes on to argue that, even if $3090.84 was the proper amount of his monthly payment, Bank of America failed to follow its own procedures when it applied the $5500 in payments made for July and August 2010 to monthly payments, instead of applying them to the

suspense account (presumably to allow the funds from the June 2010 payment to be used sooner). We reject this argument also. Assuming *arguendo* that there is sufficient evidence in this case of Bank of America's internal procedures, the parties' relationship here is governed by a contract. Internal policies and procedures cannot be used to impose additional duties not set forth in that contract or to alter or enlarge the existing duties as the contract defines them. See *Schweihs v. Chase Home Finance LLC*, 2021 IL App (1st) 191779, ¶¶ 40, 42. Bank of America's holding of the June 2010 payment in the suspense account and not applying it until September 29, 2010, is allowable within the discretion granted to it in section 1 of the mortgage about when to apply the funds. Accordingly, the trial court's finding that Fiorentino failed to prove that this was a breach of contract is not contrary to the manifest weight of the evidence.

¶ 46                                    *b. Monthly account and escrow statements*

¶ 47        Fiorentino also argues that the contract was breached by Bank of America's failure to send him monthly statements and escrow account analyses that accurately informed him that it was requiring him to make a monthly payment in the amount of $3090.84 for the period commencing May 1, 2010. He argues that the evidence that Bank of America failed to do this was uncontradicted, and the trial court arbitrarily and capriciously ignored this evidence in finding that he had not proven a breach of contract.

¶ 48        Our review of the record actually shows little evidence or argument on the topic of monthly statements or escrow account analyses and about how the contract was breached by what Bank of America sent or failed to send. Fiorentino's testimony was that he received statements during this time period reflecting escrow, but "some of them were conflicting." He testified that he did not "remember the specific date or month in which I was getting a regular statement that accurately depicted the monthly payments due." Only one monthly statement (dated June 29, 2010) is

included in the record. We see no other evidence about what monthly statements were or were not sent or what information they contained. Also, Fiorentino does not cite us to any contract provision concerning monthly statements. Based on this, any conclusion that Fiorentino did not prove that this was a breach of contract was not against the manifest weight of the evidence.

¶ 49     As for his claim that Bank of America failed to send him accurate escrow account analyses, Fiorentino cites to the provision in section 3 of the mortgage contract requiring Bank of America to send him written notice of any escrow account shortages. Specifically, this requirement of section 3 states:

> "If there is a shortage of Funds held in escrow, as defined under RESPA [(the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* (2006))], Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments."

RESPA requires a mortgage servicer to notify a borrower of a shortage in his or her escrow account only one time per year. *Id.* § 2609(b) (mortgage servicer "shall notify the borrower not less than annually of any shortage of funds in the escrow account"); 24 C.F.R. § 3500.17(f)(5) (2010) ("servicer shall notify the borrower at least once during the escrow account computation year if there is a shortage or deficiency in the escrow account," which "may be part of the annual escrow account statement").

¶ 50     The evidence at trial showed that Bank of America sent Fiorentino an escrow account analysis dated April 29, 2010, notifying him of the shortage in his escrow account. That statement reflected that, of the $3006.13 that was stated to be the escrow portion of his monthly payment effective June 2010, $1054.09 of that sum was for the "[s]hortage payment," *i.e.*, "[t]he monthly amount

you must pay into your escrow account to keep the balance from falling below zero for the year." The remainder of that sum comprised $1674.13 as the base monthly amount needed to pay the projected property taxes and insurance premiums and $277.91 as the reserve allowed for unexpected tax and insurance increases and other costs. The statement also informed him that his escrow account balance at that time was negative $7626.63.

¶ 51    We recognize that Fiorentino's testified at trial that he did not believe that $3006.13 was the accurate amount of his escrow obligation, due to the fact that this annual escrow statement was issued between the time that Bank of America purchased the force-placed hazard insurance and the time that it credited the premium back to his escrow account. We also recognize that the evidence showed that Bank of America only required an escrow payment of $778.53 after that time. However, this does not establish a breach of contract. The evidence put on by Fiorentino fell short of showing that Bank of America improperly calculated his escrow obligation in the annual escrow analysis statement it sent to him on April 29, 2010.[2] In that statement, Bank of America informed him of the negative balance of his escrow account as of that time, as well as the amount of monthly shortage payments needed to bring that balance to a positive amount over a 12-month period. By doing so, Bank of America complied with the contract's requirement that it "notify Borrower as required by RESPA" of the shortage of funds in the escrow account.[3] By the contract's incorporation of the requirements of RESPA, Bank of America was required to do this only one time per year. There does not appear to be any contractual requirement for Bank of America to

---

[2] Section 3 of the mortgage contract allowed the lender to collect escrow funds not exceeding the minimum permitted under RESPA and required it to "estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law."

[3] We note that Bank of America was required to notify Fiorentino of the amount of the escrow account shortage but had the option under RESPA to allow the shortage to exist without seeking to collect it. See 24 C.F.R. § 3500.17(f)(3)(ii)(A) (2010) ("The servicer may allow a shortage to exist and do nothing to change it").

have recalculated the escrow analysis again after the force-placed hazard insurance premium was recredited to Fiorentino's account.

¶ 52    Furthermore, we find it significant that the evidence showed that, by at least August 27, 2010, Fiorentino had received information from Bank of America that $3090.84 was the amount that it expected to receive from Fiorentino as his regular monthly payment. Fiorentino made payments in this amount for several months after this time. The evidence showed that the reason he eventually stopped making payments in this amount was not due to a lack of information about whether this was the amount that Bank of America wanted to receive from him as a regular monthly payment. Rather, his testimony was that the reason he began making payments of less than that amount was because he wanted the excess over $2312.31 to be applied to the principal balance and he was dissatisfied with the way that Bank of America was applying it. In other words, the evidence supports the conclusion that the reason Fiorentino was not making regular monthly payments in the correct amount was not because Bank of America failed to give him accurate information about the amount of his escrow obligation, but rather it was because of his incorrect interpretation that the loan modification agreement did not require an escrow obligation at all.

¶ 53                          *c. Totality of the evidence*

¶ 54    Fiorentino argues that the totality of the evidence supported a judgment in his favor on the counterclaim for breach of contract. However, we find that this is simply a rehashing of the various arguments that we have addressed and rejected above. The trial court's judgment is not against the manifest weight of the evidence. He also argues, in a single sentence, that the trial court's finding that the Lender had established all of the elements of its claim for breach of the mortgage contract is against the manifest weight of the evidence and should be reversed. This conclusory sentence fails to satisfy the requirement of an argument under Illinois Supreme Court Rule 341(h)(7) (eff.

Oct. 1, 2020), and therefore we find review of the issue forfeited. *Maday v. Township High School District 211*, 2018 IL App (1st) 180294, ¶ 50. However, even if the issue was not forfeited, we agree with the trial court's assessment that there was no evidence presented at trial demonstrating that Fiorentino was ever current on his loan at any time after the time the parties entered into the loan modification agreement. Accordingly, the trial court's finding that Fiorentino was in breach of the mortgage contract is not against the manifest weight of the evidence.

¶ 55                                B. Summary Judgment

¶ 56        Fiorentino's final argument on appeal is that the trial court erred in granting summary judgment against him on his affirmative defense and counterclaim under the Consumer Fraud Act (815 ILCS 505/1 *et seq.* (West 2014)). While the Lender argued multiple reasons why summary judgment was appropriate on the Consumer Fraud Act allegations, the record indicates that the trial court granted summary judgment on the basis that the allegations amounted merely to breach of contract, not consumer fraud, because they involved only a failure to perform according to the terms of the mortgage documents. On appeal, Fiorentino argues that, even if Bank of America's conduct gave rise to a claim for breach of contract, his allegations that its conduct in servicing his mortgage was "unfair" also supports an independent claim under the Consumer Fraud Act.

¶ 57        A motion for summary judgment should be granted only where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue as to any material fact and that the moving party is clearly entitled to judgment as a matter of law. *Board of Education of Richland School District No. 88A v. City of Crest Hill*, 2021 IL 126444, ¶ 20; 735 ILCS 5/2-1005(c) (West 2018). A trial court's order granting summary judgment is reviewed *de novo*. *Walker v. Chasteen*, 2021 IL 126086, ¶ 13.

¶ 58        The Consumer Fraud Act is a regulatory and remedial statute intended to protect consumers,

borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 416-17 (2002). Recovery may be had for "unfair" as well as "deceptive" conduct, and an act or practice can be unfair without being deceptive. *Rockford Memorial Hospital v. Havrilesko*, 368 Ill. App. 3d 115, 121 (2006). The criteria for evaluating unfair conduct is whether it (1) offends public policy, (2) is immoral, unethical, oppressive, or unscrupulous, and (3) causes substantial injury to consumers. *Dubey v. Public Storage, Inc.*, 395 Ill. App. 3d 342, 354 (2009). Unfairness is evaluated on a case-by-case basis, and a practice may be unfair without all three criteria being met. *Id.*

¶ 59     However, "[a] breach of contractual promise, without more, is not actionable under the Consumer Fraud Act." *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 169 (2005). In *Avery*, the supreme court quoted the appellate court's explanation of the rationale behind this principle as follows:

> " 'What plaintiff calls 'consumer fraud' or 'deception' is simply defendants' failure to fulfill their contractual obligations. Were our courts to accept plaintiff's assertion that promises that go unfulfilled are actionable under the Consumer Fraud Act, consumer plaintiffs could convert any suit for breach of contract into a consumer fraud action. However, it is settled that the Consumer Fraud Act was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy. [Citations.] We believe that a 'deceptive act or practice' involves more than the mere fact that a defendant promised something and then failed to do it. That type of 'misrepresentation' occurs every time a defendant breaches a contract.' " *Id.* (quoting *Zankle v. Queen Anne Landscaping*, 311 Ill. App. 3d 308, 312 (2000)).

¶ 60     Fiorentino's second amended affirmative defenses and counterclaim under the Consumer

Fraud Act allege that the Lender and its agent engaged in the following unfair acts: (1) failing to honor its obligations under the loan modification agreement, (2) creating an escrow account for insurance when the modification agreement made no mention of an escrow account, (3) debiting Fiorentino's account for the purchase of force-placed insurance and then failing to credit the premium fee once Fiorentino proved that insurance was in place on the property, (4) misapplying or failing to apply payments made by Fiorentino to his account, (5) ignoring and failing to answer Fiorentino's requests for accurate statements of his account, (6) filing a foreclosure lawsuit when Fiorentino was not in breach of the mortgage or note, and (7) accepting payments in 2014 despite having no intention of honoring the loan modification agreement or rectifying its breach thereof.

¶ 61        We agree with the trial court that each of these allegations of unfair conduct is essentially an allegation that the Lender or its agent failed to perform in accordance with their obligations under the mortgage contracts. Each of these matters is controlled by the parties' undertakings and obligations with respect to one another as set forth in these contract documents, and in fact the consumer fraud allegations are largely the same as the allegations in the counterclaim for breach of contract. Accordingly, summary judgment was properly granted under the principle that a breach of a contractual promise without more is not actionable under the Consumer Fraud Act. *Avery*, 216 Ill. 2d at 169. We reject Fiorentino's argument that this principle is inapplicable because he has alleged that Bank of America's conduct was "unfair," as the claims are still based on the alleged failure to satisfy undertakings and obligations controlled by contract. See *Philadelphia Indemnity Insurance Co. v. Chicago Title Insurance Co.*, 771 F.3d 391, 402 (7th Cir. 2014).

¶ 62                                        III. CONCLUSION

¶ 63        For the reasons set forth above, the judgment of the trial court is affirmed.

¶ 64        Affirmed.